# CIRCUIT COURT NO. 2 OF BALTIMORE CITY

Filed March 21, 1927.

HARRY APPLESTEIN AND RENA APPLESTEIN, HUSBAND AND WIFE, PLAINTIFFS,
VS.
THE MAYOR AND CITY COUNCIL OF BALTIMORE, A BODY CORPORATE, DEFENDANTS.

*Samuel K. Dennis* and *Gerald W. Hill* for the plaintiffs.

*Charles C. Wallace*, City Solicitor, and *John Henry Lewin*, Assistant City Solicitor, for the defendants.

*Arthur L. Jackson* appeared as amicus curiae.

STANTON, J.—

The questions to be decided in this case arise out of the following facts: The latter part of January, 1926, Hyman Feldman filed an application in the office of the Building Engineer (Mr. Osborne) for a permit to erect two stores and apartments on the lot situate at the northwest corner of Gwynn Oak and Oxford avenues. This location is in a suburban portion of Baltimore City known as Howard Park. Under the terms of an ordinance of the Mayor and City Council, No. 522, approved December 14th, 1925, and which ordinance, since its approval, has been generally spoken of as the Zoning Ordinance, notice of an application for the erection of buildings coming within the terms of that ordinance is required to be posted on the premises. The notice was posted in the latter part of January, 1926, and resulted in a written protest against the granting of the application signed by two hundred and twenty-one property owners and residents of the locality, living within an area of two blocks in each direction from the corner of Gwynn Oak avenue and Oxford avenue. This protest was filed in the office of the Building Engineer on February 5th, 1926. Mr. Osborne cannot

remember the cause for the delay, but it was not until March 20th, 1926, that the Building Engineer disapproved the application and refused to issue the permit. Mr. Osborne surmises that it was for some purpose of Mr. Feldman that the matter was held in a suspended state, and again, on April 14th, 1926, he issues another written notice of disapproval in exact terms with his letter of March 20th.

The very next day, April 15th, 1926, Mr. Feldman files another application in the office of the Building Engineer, in which he asked for a permit to erect two stores on the lot at the northwest corner of Gwynn Oak avenue and Oxford avenue, and again the property was posted giving notice of this second application. This second application brought forth another protest by the Howard Park Improvement Association, which was filed in the office of the Building Engineer about the 23rd or 24th of April, 1923. Again the application was disapproved and the permit was refused. Thereupon Mr. Feldman appealed under the right given in the Ordinance No. 522 to the Board of Zoning Appeals. The matter was heard by this board and the decision of the Zoning Commissioner (Mr. Osborne) was affirmed. Thereupon Mr. Feldman appealed to the Baltimore City Court, again invoking the right given to him under the Ordinance No. 522, and the appeal was heard in the Baltimore City Court *before a jury*, wherein a verdict was rendered on or about September 15th, 1926, sustaining the findings of the Board of Zoning Appeals.

Mr. Feldman's wife did not obtain a deed to this property until April 19th, 1926, and therefore when he made application for a permit to build in the latter part of January neither he nor his wife had any record title. It is true he testified that he had either negotiated or contracted for the purchase of the property some time in January of 1926, but when negotiations for the purchase were begun, and the deed was executed and delivered, Ordinance No. 522, commonly called the Zoning Ordinance, was in operation and has been held by the Court of Appeals of Maryland to be a perfectly valid and binding ordinance. Mr. Feldman and his wife were therefore charged with full knowledge of its terms and provisions, and became the purchasers of

this lot with full notice of the necessity to obtain a permit as therein provided. But having invoked its provisions, and having been denied his application, he conceived the idea of evading further action thereunder and determined to go directly to the City Council for relief. It was not until October 1st, 1926, that Ordinance No. 522 was superseded by Ordinance No. 829, approved October 1st, 1926.

Following the trial in the Baltimore City Court, and some time before October 25th, 1926, Mr. Feldman visited Mr. Flack, the head of the Bureau of Legislative Reference for Baltimore City, and requested Mr. Flack to prepare for him an ordinance granting a permit to Harry Appelstein to erect a two-story brick building for use as an apartment house and stores on his premises 3120-22 Gwynn Oak avenue.

Until this time all applications for permits to build on this lot were designated as property located at the northwest corner of Gwynn Oak and Oxford avenues, but in this ordinance the property is designated by a lot number. This is significant, because Mr. Osborne testifies that when the Ordinance No. 896, which is the Applestein ordinance, was submitted to him for a report, the fact that he had twice before disapproved a similar application to build stores on this property was not brought to his attention, because the lot numbers did not signify nor disclose that fact. The ordinance, after being prepared by Mr. Flack, who had been told by Mr. Feldman that it was desired to meet some complaints about area restrictions, was placed on the desk of Mr. Ford, the councilman for that district, as is customary, and when Mr. Ford found it on his desk, he introduced it in the City Council as a matter of course. After it had been introduced, and while awaiting a report from the Building Engineer, Mr. Feldman visited Mr. Ford several times, and upon inquiry by Mr. Ford as to whether there was any objection or opposition to the location of stores on that lot, Mr. Feldman replied "none whatever." Mr. Ford did not know, and Mr. Feldman at no time told him, of his two previous applications to build stores having been disapproved, or that the permit had been denied by the Board of Zoning Appeals, and by a jury in the Baltimore City Court. He not only suppressed these very impor-

tant facts, but he expressly stated to Mr. Ford that there was no opposition. There can be no doubt under the evidence in this case, and the reasonable inferences to be drawn therefrom, that Mr. Feldman knew of the protest signed by the two hundred and twenty-one property owners and residents of this community, from the manner in which he was following up the application in January, 1926, and also because Mr. Murphy, the president of the Howard Park Improvement Association, told him about the written protest when he and Mr. Feldman discussed the possibility of meeting the objections of the Howard Park Improvement Association. Mr. Applestein must be charged with the same knowledge, because he was told all about the matter by Mr. Feldman, with whom he resided. Mr. Applestein is a son-in-law of Mr. Feldman, and he and his wife reside in the Feldman home, where the matter of the difficulty in the office of the Building Engineer and the Board of Zoning Appeals, and the Baltimore City Court was discussed when the family were in the home at night, as well as at meal time. Therefore, in dealing with these ordinances and the entire transaction under them, Mr. Feldman and Mr. Applestein must be regarded as one and the same person. The evidence will not permit of any other conclusion.

Acting on the representations made to him by Mr. Feldman, the passage of Ordinance No. 896 was sponsored by Mr. Ford. He reported its progress through the Council to Mr. Feldman, who called upon him several times, and on one of these occasions Mr. Ford showed him a letter which he had received from Mr. Osborne, indicating his approval, and that of the Baltimore City Fire Department. The ordinance was passed and was approved November 30th, 1926. Either on December 15th or 17th—both dates are named in the evidence — Mr. Feldman began to clear the lot, and dig the footings for the foundation of the building. Mr. Gilbert, the secretary of the Howard Park Improvement Association, who resides a few doors from the lot in question, observed digging on December 17th, and he immediately reported to Mr. Murphy that work was being undertaken. This was the first notice that anyone connected with the Howard Park Improvement Association had of the passage of Ordinance No. 896.

Mr. Murphy and Mr. Gilbert, acting for the Howard Park Improvement Association, began an effort for the repeal of Ordinance 896, and had introduced in the City Council on December 20th, 1926, the ordinance which is called the Repealing Ordinance. Mr. Feldman was in the City Council chamber when the Repealing Ordinance was introduced by Mr. Ford, and was fully advised of the proposed legislation. The City Council adjourned on that date for the Christmas recess. It convened on January 10th, 1927, and a public hearing was held on the Repealing Ordinance on January 17th. Mr. Feldman was present at this meeting, accompanied by counsel. Mr. Ford attended the meeting and made a statement to the committee that Mr. Feldman had told him that there was no opposition to the Applestein Ordinance, and that he (Mr. Ford) had been deceived by Mr. Feldman in urging him to bring about the passage of the ordinance. When the Repealing Ordinance was before the City Council for final passage, Mr. Feldman was present in the City Council chamber and had every opportunity to hear Mr. Ford make a statement to the City Council along the same lines as he had done before the committee at the public hearing. The Repealing Ordinance was passed, and was approved on February 5th, 1927, and is known as Ordinance No. 978.

Fully advised as he was of the probable action of the City Council in repealing the Applestein Ordinance (No. 896), Mr. Feldman continued the erection of the building—some of the witnesses say the work was unduly rushed —and after the Repealing Ordinance was approved, Mr. Applestein and his wife came into this Court under the claim of ownership, and as the real parties in interest, praying that the Repealing Ordinance No. 978 be declared null and void, and that the Mayor and City Council of Baltimore, its officers and agents, be enjoined from revoking or cancelling the permit issued under Ordinance No. 896, and from obstructing or interfering with the plaintiffs in or about the construction of the building on the lots Nos. 3120-3122 Gwynn Oak Avenue, and that the Mayor and City Council be enjoined from procuring any warrants for the arrest or prosecution of the plaintiffs in any matter or thing in connection with the work being done in or about the premises.

Many interesting questions were discussed in the argument of the case, and chief among them is the contention that the Repealing Ordinance is illegal and void, because it bears no relation to the police powers of the State, and would deprive Applestein of a contract granted to him by Ordinance 896 to erect the stores and apartments, which is merely the exercise of his rights under the permit in improving his own lot.

This argument raises a very close point. There are numerous cases in which the Court has held that where the municipality acts in the exercise of its powers and enters into contracts with individuals or corporations, and grants licenses or permits in the nature of contracts, and on which the licensee or holder of the permit acts, the municipality will not be permitted to retract or repudiate any such undertakings. Most of the cases cited by the plaintiffs under the point of deprivation of his contract rights under Ordinance 896, are cases involving contracts for the installation and operation of water systems, special tax rates, operation of canals, and like subjects. But whenever the municipality acts in furtherance of and to protect the public health, morals and safety, then it may revoke any license or permit which had been granted, even though the licensee or holder of the permit had acted on the right thus granted. It is hardly ever free from difficulty to determine, and under what circumstances such action by the municipality is a contract, or when it is in pursuance of the exercise of its police power. The case which most nearly touches the matter now before the Court is that in 74 N. Y. Supp., Page 104, City of New York vs. Herdje. In that case, the owner of a lot had actually commenced work in the building of a tenement house under a permit which had been granted, and before, as it was claimed, the Act of the Legislature became effective which impaired his rights under the permit. The argument was made in that case, as in this, that inasmuch as the permit had been granted in accordance with the laws actually in force, and the holder of the permit had made a contract with one Donecke to build upon the land, his inchoate right to build became an absolute property right, and that the law passed destroyed this right; impaired the obligation of the contract, and is therefore unconstitutional.

The Court said in that case that the answer to the argument was that the legislation in question is in the exercise of the police power, and in the interest of the public health, morals and safety as involved in the use of the property, and that therefore neither the fact that the defendant had received the permit nor that he had made a contract for the construction of the building, relieved him from this exercise of an act of sovereignty.

In the case of Portland vs. Cook, 87 Pac. 772, a similar argument was made and answered, and the Court held that expenditures made by a licensee holding a permit to erect a slaughter house and cold storage plant did not prevent the repeal of the ordinance granting the permit at any time the public health, morals and safety of the community might require.

Most of the Maryland cases which were cited involved the use of the bed of streets, and other public property as distinguished from the instant case. which is the improvement and use of the licensee's own land. In the Rittenhouse case, in 25 Md. 336, the Court of Appeals of Maryland decided that the Mayor and City Council of Baltimore could repeal an ordinance to build an almshouse, even though contracts were outstanding and actually in process of performance, because the Mayor and City Council acted in its public, political and municipal character, and said this:

"In considering the rights, powers and liabilities of public municipal corporations in respect to contracts made by them, regard must be had to the subject matter to which contracts relate, and the character in which the municipal body acts in making them. Where the corporation appears in the character of a mere property holder, and enters into a contract with reference to such property as any private citizen or other proprietor might do; or where it engages in an enterprise, not necessarily connected with or growing out of its public capacity, as a part of the local government; there all its rights and liabilities are to be measured and determined by the same rules as govern mere individual persons, or private corporations; and it cannot claim exemption or immunity from the legal liabilities growing out of its con-

tracts, by reason of its public municipal character."

The Court concludes that where the City Council acts in the exercise of powers entrusted to them in their municipal character exclusively for public purposes, then the courts have no power to review or control their acts, unless they transcend the limits of their delegated powers.

But outside of and independent of the question of impairing contractual rights, the controlling reason for the decision in this case results from the conduct of Mr. Feldman in his effort to bring about the enactment of Ordinance No. 896.

Fraud is not only an overt act or a spoken word. It may be the suppression of facts when they should be disclosed. Mr. Feldman never informed Mr. Ford, nor did he lay before the City Council, in any manner, or at any time, while the ordinance was under consideration, the history of his effort to obtain a permit for the erection of stores and apartments on this lot. And when he was asked if there was any objection or opposition to the erection of such a structure, his reply was "none whatever." Obviously Mr. Feldman was launching an effort to outpoint and outwit the protestants, who had thus far been successful in their protest against the granting of the permit. And in his effort to accomplish his purpose, he over-reached himself. He deliberately made the statement to Mr. Ford that there was no objection or opposition, and did in fact mislead and deceive him. It is reasonable to assume that but for his assurance Ordinance 896 would either have not been introduced, or if it had been, it would have been in such a manner, in ordinary course, as t h a t notice would have been given to the public, and opportunity afforded to make known any objections or protests to the passage of the ordinance. This Mr. Feldman wanted to avoid, in the light of his past experience concerning a permit to build on this lot. That he did make the statement to Mr. Ford is found as a fact. Not only did the necessity of the occasion, as Mr. Feldman viewed it, justify him to so state, but the positive testimony by Mr. Ford, that he was deceived by Mr. Feldman, is emphasized by the manner in which Mr. Feldman testified in this case. His recollection served him only when it was to his advantage, and his demeanor was anything but assuring.

Misrepresentation or fraud will vitiate a contract between individuals, and the Court fails to see why it should not apply in this case. If the legislative act of a City Council is obtained by the suppression of existing and material facts, and upon discovery of such conduct the City Council passes an ordinance to frustrate the fraud which had been exercised upon it, reason and common sense would extend to it the same right as is accorded an individual.

It is no answer to say that Mr. Feldman has acted under the permit, and has expended or obligated himself for large sums of money for materials to go into the building. It is to be noted that it is Mr. Feldman who has contracted for and obligated himself for large sums of money to pay for the labor and materials to go into this structure, and not Mr. Applestein. It is a most unusual exhibition of paternal interest in a son-in-law, whose name he has placed in a deed dated the 1st day of December, 1926, and now of record among the Land Records of Baltimore City, together with Mr. Feldman's daughter; when the gift to the daughter could have been just as effectually made by a deed to her alone; and thereby assure some interest returning to the father or mother, in the event the daughter should predecease the husband. If such an unhappy situation should transpire, under the rights flowing from the surface indications of this transaction, the deed would give to this son-in-law of about fifteen months the pretended dower estimated at about $40,000.00. The entire scheme, from its inception to the present, the Court regards as a pure shell and subterfuge. Mr. Feldman had spent or incurred obligations for only about one hundred or one hundred and fifty dollars when the Repealing Ordinance was introduced. Every dollar spent or contracted for since this day has been with notice of the impending revocation of his permit. The Ordinance No. 896, so far as Feldman and Applestein are concerned, having been conceived and obtained in fraud, he cannot be heard to urge the loss of any amount expended in its consummation.

For the foregoing reasons, the injunction will be dissolved and the bill of complaint will be dismissed; the plaintiffs to pay the costs.